IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES DOBSON, an individual,<br><br>                                 Plaintiff,<br><br>                          v.<br><br>ACHILLES USA, INC., a Washington for-profit corporation,<br><br>                                Defendant. | No.<br><br>COMPLAINT<br><br>AND JURY DEMAND |

COMES NOW, Plaintiff JAMES DOBSON, by and through his attorneys, and alleges as follows:

### I. PARTIES

1.1     Plaintiff, JAMES DOBSON, ("Plaintiff") is an unmarried individual residing in the State of Washington.

1.2     Defendant, ACHILLES USA, INC., ("Defendant" or "Achilles") is a for-profit corporation incorporated in the State of Washington.

### II. JURISDICTION AND VENUE

2.1     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this complaint contains claims arising under federal law. This Court

COMPLAINT – Page 1

also has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

2.2 This Court has personal jurisdiction over Defendant as it is a Washington corporation.

2.3 Venue is appropriate in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(2) as the acts or omissions giving rise to the claims occurred in this district. The Seattle division is appropriate pursuant to LCR 3(d)(1) as the acts or omissions occurred in Snohomish County.

### III. FACTS AND CIRCUMSTANCES

These factual allegations are not intended to be exhaustive in nature and are written solely to provide notice to Defendant of the general nature of Plaintiff's claims.

3.1 Defendant operates a factory that produces plastic materials. It is located in Everett, Washington.

3.2 Plaintiff identifies as a Black African American.

3.3 Plaintiff worked for Defendant from August 2011 until his termination in January 2021, first as a contracted employee through a staffing agency, and then as a regular employee.

3.4 Plaintiff started his employment with Defendant at the "bottom" as a roll miller, and received several promotions, until he became an assistant lead operator in 2019.

3.5 During his employment, Plaintiff was subjected to a series of adverse employment actions, hostility, and bullying.

3.6 For example, during Plaintiff's employment with Achilles, the facility where he worked had Nazi swastika graffiti in bathrooms and the locker room, including directly above Plaintiff's assigned locker.

3.7 Plaintiff complained about the swastikas on multiple occasions to Mr. Ron Smith and Mr. Jason Brown, the heads of production at the facility.

3.8     In 2016, Plaintiff received improper training from lead operator Romeo Hobson, about how to close the rollers during production. Mr. Hobson instructed Plaintiff to close using the computer settings. When Plaintiff followed those instructions, the rollers touched which is a production error called "kissing the calender."

3.9     A calender (not a misspelling) is a series of rollers used to finish a sheet of material such as plastic. Kissing the calender results in damage to the rollers, lost product, and production delays. Rollers must be replaced after they are damaged because they no longer produce even sheets of material.

3.10    Plaintiff was written up for the accident. The lead operator, who was not African American and whose orders Plaintiff was following, was not written up.

3.11    Defendant subsequently changed the closing process to require two additional employees to watch the rollers while an operator closes the rollers. Their job is to indicate when the operator should stop closing the rollers.

3.12    In 2019, Smith became the Production Manager. Smith appears Caucasian. Plaintiff began reporting to Smith.

3.13    Smith demonstrated a general dislike of anyone who was not Caucasian. Smith told Plaintiff on several occasions, "You people aren't smart enough." Smith referred to Plaintiff and other African American employees as "you people," and picked favorites among the employees he supervised along racial lines.

3.14    Upon information and belief, at least one African American employee resigned as a result of Smith's discriminatory comments during this time.

3.15    Defendant's employees were provided lockers. Plaintiff's locker was in close proximity to Smith's locker.

3.16    Despite Plaintiff's repeated complaints, Defendant took no action to remove the swastika above his locker for an unreasonable amount of time.

3.17	When Plaintiff's coworkers and supervisors failed to deal with the swastikas, HR eventually intervened.

3.18	In August 2019, during a conversation with Ms. Joy Margarito (Achilles HR), Plaintiff was asked by Margarito if there was anything she could do for him. Plaintiff mentioned the swastika that had remained above his locker and asked if someone could just clean it off or paint over it.

3.19	Soon after Plaintiff's conversation with Margarito, the swastika was covered up by a layer of paint (although it was still somewhat visible through the single layer of white paint.)

3.20	As another example of hostility directed toward Plaintiff, in early 2020, someone broke the lock to Plaintiff's toolbox and stole most of the specialized tools essential to Plaintiff's ability to perform his duties.

3.21	Defendant did not appear to take the theft seriously, and no new tools were issued to Plaintiff.

3.22	Plaintiff spent approximately $200.00 of his own money to buy some new tools, and he had to borrow tools from others to complete his work.

3.23	About a month after his tools were stolen, Plaintiff's work notebook was stolen. This notebook was essential to Plaintiff's job duties because it was how he tracked recipes for plastic production and these recipes were necessary in order for Plaintiff to do his job.

3.24	Plaintiff reported the theft of the notebook to management, but Achilles took no apparent action.

3.25	After Plaintiff complained to his supervisors about the swastika, Plaintiff was written up twice for kissing the calenders.

3.26	On July 16, 2020 Plaintiff was written up for kissing the calender when he was working under the guidance of lead operator Mr. Dave Coates.

3.27 After Plaintiff and Coates closed up together on the 28E calender line, Coates indicated that everything was set up correctly and instructed Plaintiff to help the roll mill in a different area of the facility.

3.28 Plaintiff left the 28E calender line area. When he was at the roll mill, he heard the closing alarms from the calenders turn on.

3.29 Coates then claimed that Plaintiff had kissed the calender, but this was not possible given Plaintiff's absence from the area.

3.30 Shortly after that incident, Coates took extended leave and Plaintiff was temporarily promoted to lead operator of the 28E line for about six months.

3.31 While Plaintiff was acting lead operator, there were no incidents of kissing the calender.

3.32 Coates returned to work from extended leave at the beginning of December 2020.

3.33 Shortly thereafter, when Plaintiff was using the restroom, Smith smirked and asked Plaintiff what he thought now that Coates was back. Plaintiff had no real reaction.

3.34 The final instance of Plaintiff allegedly "kissing the calender" was on or about Monday, December 14, 2020.

3.35 When Plaintiff arrived at work that day, he sought guidance from Coates because a different crew left the calenders in an extreme open position which allowed the machine's stock guides to make marks on the calender rollers.

3.36 Plaintiff followed the instructions that Coates gave him. After Plaintiff closed the rollers under Coates's direction, Coates indicated that everything was set up properly and instructed Plaintiff to set up another piece of machinery.

3.37 Plaintiff left the immediate area to accomplish that next task. While he was away, he heard the roller's closing alarms turn back on while he was away.

3.38   Mr. Jason Breeding then entered from the staging area carrying metal shavings in his hands and asserted that Plaintiff had kissed the calender.  However, the calender had not been kissed until after Plaintiff left the area.

3.39   Additionally, the rollers only "kissed" on the gear side which allowed the Defendant to continue operating the production line. The rollers are slightly bowed outward in the center and kissing them during production results in contact at the center of the rollers.

3.40   The fact that the rollers kissed only on one far end indicates that Defendant's employees deliberately acted to give Plaintiff his third strike while still allowing the production line to operate.

3.41   Once again, Plaintiff was the only one written up for "kissing the calender" even though his actions could not have resulted in that error.

3.42   On January 4, 2021, upon returning to work after the holiday shutdown, Plaintiff was asked by Smith to meet him in Margarito's office.  At this meeting, Plaintiff was informed that his employment was being terminated.

3.43   When Plaintiff tried to explain, Plaintiff was told that the decision to terminate his employment had already been made.

3.44   Smith then walked Plaintiff to his car and said, "it took years, but I finally got you."

## IV.   CAUSES OF ACTION

### A. VIOLATION OF WASHINGTON'S LAW AGAINST DISCRIMINATION, RCW 49.60.180 and 49.60.210

4.1   Plaintiff realleges and incorporates by reference all paragraphs above.

4.2   Defendant discriminated against Plaintiff in violation of RCW 49.60.180.

4.3   Plaintiff's complaint about the swastikas was protected activity and was a substantial factor in Defendant's adverse actions against Plaintiff.

### B. 42 U.S.C. §1981(a)

4.4   Plaintiff re-alleges and incorporates by reference  paragraphs above.

4.5     Defendant discriminated against Plaintiff and retaliated against Plaintiff in violation of 42 U.S.C. §1981(a).

## V.     RESERVATION OF RIGHTS

5.1     Plaintiff reserves the right to amend this complaint as to the factual allegations contained herein, and to add any and all other claims or parties that may arise out of or become known in this lawsuit.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, having asserted claims for relief, now prays for judgment as follows:

(a)     That the Court award Plaintiff general and special damages in an amount to be proven at trial.

(b)     That the Court award Plaintiff prejudgment and post-judgment interest on the damages award.

(c)     That Plaintiff be awarded punitive damages pursuant to 42 U.S.C. §1981(a).

(d)     That the Court award legal costs and attorney's fees as allowed by law, RCW 49.60.030, 42 U.S.C. §1988(b).

(e)     That the Court award Plaintiff any other such relief, including but not limited to injunctive relief, as the Court finds equitable, just, or proper.

## JURY DEMAND

Plaintiff hereby demands trial by Jury pursuant to FRCP 38(b) on all issues so triable, except that Plaintiff does not seek a jury determination of the present value of future damages.

DATED this 6th day of November, 2023.

BEAN LAW GROUP

*s/Matthew J. Bean*
Matthew J. Bean, WSBA #23221
*Attorney for Plaintiff*

COMPLAINT – Page 7

BEAN LAW GROUP
2200 6th Ave, Suite 500
Seattle, WA 98121
(206) 522-0618